# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

_____
                                              )
**SUSTAINABLE FISHERIES COALITION**           )
**3 State Pier**                              )
**Gloucester, Mass. 01930**                   )
                                              )
  **Plaintiff,**                    )
                                              )
**v.**                                        ) **Civil Action No. 21-10204**
                                              )
**THE HONORABLE WYNN COGGINS,**               )
**in her official capacity as the Acting Secretary of**  )
**Commerce,**                                 )
**United States Department of Commerce**      )
**1401 Constitution Avenue, N.W.**            )
**Washington, D.C.  20230**                   )
                                              )
  **Defendant.**                     )
_____)


## COMPLAINT AND PETITION FOR REVIEW FOR INJUNCTIVE AND DECLARATORY RELIEF


**Dated:  February 5, 2021**    **Shaun M. Gehan**
           **D.C. Bar No. 483720**
           **The Law Office of Shaun M. Gehan**
           **1101 30th Street, N.W.**
           **Suite 500**
           **Washington, D.C.  20007**

           **Telephone:  (202) 412-2508**

           **Attorney for Plaintiff**

## I.   <u>INTRODUCTION</u>

1.      Plaintiff, Sustainable Fisheries Coalition ("SFC"), brings this action to challenge aspects of the Defendant Secretary of Commerce's designee National Marine Fisheries Service's ("NMFS") final rule implementing Amendment 8 to the Fishery Management Plan ("FMP") for Atlantic Herring ("Amendment 8").  86 Fed. Reg. 1810, 1890 (Jan. 11, 2021).

2.      Specifically, Plaintiff challenges the final rule implementing the exclusion of mid-water trawl ("MWT") vessels engaged in herring and mackerel fishing in certain waters.  Many SFC participants in the trade association rely in whole or in part on the use of MWT gear to provide income from these fisheries.  Moreover, the waters that will be closed to these vessels comprise an area which typically accounts for more than thirty percent of the Atlantic herring and mackerel fisheries' annual revenues.  All members of SFC are injured by Defendant's unlawful actions complained of herein.

3.      MWT gear is the most cost-effective, efficient, and environmentally-friendly fishing gear used to harvest herring and mackerel, and it is effectively the only gear that can practicably be used in many of the important fishing areas to be closed to this gear type.

4.      Amendment 8 is challenged here as being promulgated in excess of the Secretary's regulatory authority, without a record basis, in a manner inconsistent with the standards of reasoned decisionmaking, and in violation of applicable law, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 and the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), as explained in detail below.

5.      Plaintiff SFC is suffering harm from the Secretary's unlawful action and will continue to suffer if not granted the relief requested herein.

6.     For these reasons, and as explained below, SFC respectfully asks this Court to vacate Amendment 8 to the extent requested, remand the rule to the Secretary, grant Plaintiff its attorneys' fees and costs, and provide any additional relief as is just and proper.

## II.    PARTIES

7.     Plaintiff SFC is an unincorporated trade association whose participants include herring fishing, herring processing, and herring wholesale companies located from Maine to North Carolina, including all companies which own and utilize MWT vessels to harvest Atlantic herring.  These companies are: the fishing vessel *Darana R* of North Carolina; Lund's Fisheries, Inc. of Cape May, New Jersey; Seafreeze Ltd. of North Kingston, Rhode Island; NORPEL and Nordic Explorer of New Bedford, Massachusetts; Irish Venture, Inc., Cape Seafoods, Inc., and Western Sea Fishing Co., Inc. of Gloucester, Massachusetts; Ocean Spray Partnership, of South Portland, Maine; and O'Hara Corporation of Rockland, Maine. Many of its participants earn significant amounts of annual fishing revenue from the use of MWT for herring and mackerel fishing in the areas from which they will be excluded by Amendment 8.  Since its formation, SFC has been consistently active in federal herring conservation and management efforts and, along with its participants, has actively took part in the development of Amendment 8.

8.     Defendant, the Honorable Wilbur Ross, is the Secretary of the Department of Commerce.  Defendant, by and through his designees at the National Marine Fisheries Service, undertook the illegal and unauthorized actions which are challenged in this case.  Secretary Ross is sued solely in his official capacity.

### III.    JURISDICTION AND VENUE

9.      This case arises under Magnuson-Stevens Fishery Conservation and Management Act ("MSA" or "Magnuson-Stevens Act"), 16 U.S.C. §§ 1801-1891d, and the Administrative Procedure Act, 5 U.S.C. §§ 701-706.

10.     This Court has jurisdiction over this action pursuant to the Magnuson-Stevens Act, which provides that "[t]he district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the Magnuson-Stevens Act. 16 U.S.C. § 1861(d). The Magnuson-Stevens Act also provides that actions taken by the Secretary of Commerce under regulations implementing a fishery management plan shall be subject to judicial review "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable." 16 U.S.C. § 1855(f). Defendants published the Amendment 8 Final Rule on January 11, 2021 in the Federal Register.  *See* 86 Fed. Reg. 1810 (Jan, 11, 2021).  Plaintiff SFC filed this Complaint NS Petition for Review within 30 days of publication of the final rule.

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C § 2201 (the Declaratory Judgment Act); 5 U.S.C. §§ 701-06 (the Administrative Procedure Act's judicial review provisions); and 16 U.S.C. §§ 1855(f) & 1861(d) (jurisdiction for actions arising under the Magnuson-Stevens Act).  The relief sought is authorized by 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive relief), 16 U.S.C. § 1855(f)(1)(B), and 5 U.S.C. § 701-706.

12.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

**COMPLAINT AND PETITION FOR REVIEW**                                              **Page 4**

13.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events giving rise to this action occurred in this district, and 28 U.S.C. § 1291(e)(B), as the Defendant Secretary of Commerce is an officer of the United States and a substantial part of the events or omissions giving rise to the claims occurred in this district, and the Plaintiff is a resident of this district.

14.     An actual, justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

15.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

16.     Plaintiff has exhausted all administrative remedies, the agency action challenged is final and ripe for review, and, as shown herein, SFC has associational standing to bring these claims because "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

## IV.     <u>STATUTORY BACKGROUND</u>

### <u>MAGNUSON-STEVENS ACT</u>

17.     The Magnuson-Stevens Act constituted eight regional fishery management councils that serve as quasi-legislative bodies charged with developing and recommending fishery conservation and management measures for federal fisheries managed by the Secretary and his designees at NMFS.  16 U.S.C. §§ 1852(a) & (h)(1).

18.    Councils also concomitantly develop and recommend to the Secretary "proposed regulations which the Council deems necessary or appropriate for the purposes implementing a fishery management plan or plan amendment . . . ." *Id.* § 1853(c).

19.    All such recommendations must be consistent with the ten National Standards for Fishery Conservation and Management, including the requirement that such management measures "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry" and that they be "based upon the best scientific information available." *See id.* § 1851(a)(1), (2).

20.    Furthermore, when, as in the case of Amendment 8, a Council allocates fishing privileges among users of different gear types and other beneficiaries, "such allocation shall be (A) fair and equitable to all such fishermen [and] (B) reasonably calculated to promote conservation …." *Id.* § (4).  The Council must also "consider efficiency in the utilization of fishery resources," *id.* § (5), and, "where practicable, minimize costs and avoid unnecessary duplication." *Id.* § (7).

21.    There are also procedural requirements to which a management council must adhere.  For instance, every FMP or amendment thereto must be accompanied by a "fishery impact statement," akin to an environmental impact statement. *Id.* § 1853(a)(9).  This statement "*shall* assess, specify, and analyze the likely effects, if any, including the cumulative conservation, economic, and social impacts, of the conservation and management measures on, and possible mitigation measures for … participants in the fisheries and fishing communities affected by the plan or amendment." *Id.* (emphasis added).

22.    While the Secretary may not change a Council's recommendation, he must disapprove all or part of an FMP, plan amendment, or its implementing regulations to the extent

that such recommendations are inconsistent "with the fishery management plan, plan amendment, this Act and other applicable law." *Id.* § 1854(b)(1). "A notice of disapproval shall specify the applicable law with which the plan or amendment is inconsistent; the nature of such inconsistency; and recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law." *Id.*

## V.   FACTUAL ALLEGATIONS

### A.   BACKGROUND ON THE ATLANTIC HERRING FISHERY

23.   The Atlantic herring fishery extends from Cape Hatteras in North Carolina to the maritime border with Canada, although most herring harvest comes from the waters off New England south through the northern mid-Atlantic region and seaward to Georges Bank.

24.   The Atlantic herring fishery, as prosecuted by MWT vessels, is typically conducted in conjunction with fishing for Atlantic mackerel.

25.   As a general matter, herring are a more northerly stock, while mackerel tend to be more abundant in the mid-Atlantic and Southern New England.  Thus, the herring fishery is managed by the New England Fishery Management Council and the mackerel fishery is under the jurisdiction of the Mid-Atlantic Fishery Management Council.

26.   However, there is substantial mixing of these stocks throughout these regions, and nearly all the full-time limited access herring permit holders – at least those that do not fish exclusively in the Gulf of Maine with purse seine gear – also have mackerel limited access permits.  Of the two fisheries, mackerel is of relatively higher value in the market.

27.   SFC participants all operate Atlantic herring and mackerel vessels under permits issued by Defendant and according to regulations promulgated pursuant to the Magnuson-Stevens Act, 16 U.S.C. § 1801 *et seq.*

28.    The rules governing the herring fishery are included in the fishery management plan for Atlantic herring, of which Amendment 8 represents the latest major revision.

29.    The primary conservation tool for managing herring is a cap on total harvest, which has typically been established for a three-year period.  Under the MSA, this quota, or annual catch limit ("ACL"), must be based on the best scientific information available and set at a level such that there is a less than a fifty percent likelihood that "overfishing" – harvesting the stock at too high a rate – does not occur.  Generally speaking, ACLs are set by applying the maximum sustainable rate of harvest to the estimate of the population's size and reducing that number to account for scientific uncertainty and vagaries in management.

30.    Under the herring FMP, the ACL is divided among three management areas: Area 1, which is the Gulf of Maine and which is further subdivided between the inshore (Area 1A) and offshore (Area 1B) areas; Area 2, which includes nearshore waters of Southern New England and the entire mid-Atlantic region; and Area 3, the offshore waters of New England and Georges Bank.

31.    To prevent overages, fishing in each area is halted when only ninety-two percent of each area's quota is projected to have been caught.  If overages occur, they must be "paid back" at 100 percent through reductions in future quotas.

32.    The herring FMP also includes other management measures, such as limits on the size of vessels that can be used (no more than 165 feet) and horsepower restrictions.  Vessels must have monitoring systems, report catches, and carry federal fisheries observers when requested.

33.    Most herring landed on the U.S. east coast, approximately sixty-seven percent of average annual catches between 2012-2014, is harvested by larger vessels utilizing mid-water

trawl gear.  These vessels operate either singly or as "pair-trawls," which involves two vessels pulling a single net to increase horsepower and catch fish more effectively.

34.     The other predominant gear-type is referred to as "purse seines," which account for about twenty-two percent of landings over the same period.  Purse seine vessels operate by running a net around a school of herring and then closing it up like a draw-string purse.  These vessels operate predominantly, if not exclusively, in the nearshore areas of the Gulf of Maine (*i.e.*, Area 1A and, to a lesser extent, Area 1B).

35.     Both methods of harvesting herring and mackerel are efficient, although purse seines are somewhat less so, according to the Amendment 8 analysis. NMFS, Atlantic Herring Fishery Management Plan, Amendment 8, Including a Final Environmental Impact Statement and Initial Regulatory Flexibility Analysis ("Amendment 8 FEIS"), at 515 (May 2019).

36.     The herring/mackerel fishery is one of the "cleanest" fisheries on the east coast; only one to two percent of the fish caught are "non-target" species (*i.e.*, not herring or mackerel).

37.     These gear types (MWT and purse seines) are also considered to be environmentally friendly in that they are designed to operate without disturbing the sea floor.

38.     While both MWT gear and purse seines are efficient in capturing herring, purse seines can fish effectively only in some of the nearshore waters that will be closed to MWT vessels.  Other fishing grounds important to the MWT fleet, such as off the Commonwealth of Massachusetts, can only be fished by MWT gear because the tides and currents are too strong to effectively deploy purse seines.

39.     MWT vessels, however, can only catch herring where and when they are available, and, at certain times of the year, these fish are only found within areas in which

**COMPLAINT AND PETITION FOR REVIEW**                                  **Page 9**

Amendment 8 would prohibit MWT fishing.  Purse seine catches in the exclusion zone are not similarly limited by the rule at issue.

40.     Schools of herring and mackerel migrate widely throughout their range, moving inshore and off, north and south, east or west, depending on season, water temperature, and food availability.  It is thus important to the successful prosecution of this fishery that vessels be able to access the herring and mackerel resource when and where it is available in federal waters.

41.     This has become increasingly challenging over the past two decades as numerous regulations have been adopted by the New England Council and the Secretary that place significant and costly restrictions on the fishery overall, and most particularly on the MWT sector.  These restrictions, described below, have made it increasingly difficult, if not impossible for the fishery to achieve optimum yield from the fishery; that is, the annual allowable catch of herring determined by the Secretary's designees at NMFS to be sustainable.

42.     Measures to reduce bycatch—non-target species which are not kept—in the fishery include a two-percent limit on the amount of incidental catch of haddock the fishery can take.  Fishing in the relevant herring management area is stopped when the haddock cap is projected to be reached.  This cap was established even though the directed fishery for haddock takes less than fifty percent of its ACL.  The haddock bycatch cap has, in some years, closed the offshore herring fishery in Area 3 while providing no discernable benefit to the haddock stock.

43.     There is also a cap on the amount of "river herring" that can be taken in certain areas.  River herring is a generic name for certain anadromous fish species, including alewives, blueback herring, and shad, which spawn in rivers and live at sea, as do salmon.  These caps have closed important herring fishing grounds in some years.

44.     Midwater trawlers are subject to other highly restrictive measures.

**COMPLAINT AND PETITION FOR REVIEW**                                    **Page 10**

45.     For example, MWT gear cannot be used in Area 1A during the principal fishing season, June 1 through September 30.  Rather, fishing during this lucrative season when demand for herring as bait in the lobster fishery is high is reserved exclusively to purse seine vessels. Furthermore, MWTs often cannot access Area 1A when the seasonal restriction lifts on October 1 because there are typically extensive spawning closures in effect at that time.

46.     Herring vessels operating offshore are also required to have an observer on board to fish in certain defined areas closed to most fishing to protect groundfish and seafloor habitat. While midwater trawlers do not impact the sea floor or catch biologically-significant amounts of the fish these areas protect, they have become *de facto* closed areas to the MWT sector as it is allocated very few observer days because its bycatch rates are so low.

47.     There are also newer restrictions on fish releases, call "slippage," for MWT vessels.  This is a relatively rare event in which a MWT must release the catch in its net due to mechanical problems (such as with the pump), sea conditions that make it unsafe to pull a heavy net alongside the vessel, or when the catch is primarily dogfish (a small shark), which cannot be pumped.  The rules necessitate that a vessel move fifteen nautical miles away from the spot where slippage occurred.  When it applies, this rule significantly increases trip costs because vessels must burn fuel initiating a new search for fish in other areas.

48.     Finally, new requirements have just become effective that will require MWT owners to pay the cost of federal observers aboard their vessels.  These costs are significant, particularly given that herring and mackerel are relative low value, meaning that profit margins are not large.  Such additional costs can tip a trip into unprofitability.

49.     The cumulative impact of these measures has been to increase operating costs, decrease efficiency, and most importantly, make it increasingly difficult to harvest the full

amount of the area quotas, particularly offshore in Area 3 and in Area 2, and attain optimum yield from the herring fishery.

50.     Not surprisingly, the effect of conservative management in terms of ACL setting combined with the increasingly challenging regulatory regime has resulted in a very well-managed fishery.  Fishing mortality rates in the fishery have been well below the target rate for a substantial period.

51.     However, contributing to the difficulties facing the MWT sector and the herring fishery generally, has been a five-year string of what is known as poor "recruitment." Recruitment is the amount of young fish entering the population each year.  For herring, the survival of larval fish and growth into young herring is almost entirely dependent on suitable environmental conditions, such as water temperature, salinity, predation, and food availability.

52.     As a result of this poor recruitment, the Atlantic herring stock size has declined despite the low proportion of herring removed annually by the fishery.  As a precautionary measure, NMFS recommended, and the New England Council implemented, an adjustment to the 2018 quota during the fishing year.  The ACL was reduced from 104,800 metric tons ("mt") by more than half, to 49,900 mt for that year.

53.     Then in 2019, Defendant's designees established a ACL of just over 15,000 mt, and 11,571 mt for 2020-21.  Low allowable harvest levels are likely to prevail for the next few years as the stock has been declared to be "overfished" (which means that the stock size has fallen below a threshold level), even though the rates of harvest have been below target levels. Under the MSA, an "overfished" determination requires implementation of a rebuilding plan.

54.     In sum, the herring fishery is conservatively managed through a quota system and is highly responsive to changing biological conditions.  In addition, the MWT sector is governed

by a broad set of regulatory constraints, most of which have little or no conservation benefit. These measures increase costs and reduce efficiency at the same time that allowable catch levels are historically low.

**B.    DEVELOPMENT OF AND MEASURES IMPLEMENTED BY AMENDMENT 8 TO THE ATLANTIC HERRING FISHERY MANAGEMENT PLAN**

55.    Amendment 8 to the Atlantic Herring FMP was initiated to consider long-term harvest strategies for herring that would account for herring's role as a forage fish.

56.    That is to say, herring, as a relatively small and abundant schooling fish, serves as prey for many other fish, marine mammals, and sea birds.  It is one of many such important forage stocks, which also include menhaden, sand lance, bay anchovy, and many other species.

57.    To accomplish this objective, the Council sought to develop a methodology, referred to as an "acceptable biological catch" ("ABC") control rule, for determining annual catch levels.  In theory, over time, setting ACLs based on this control rule should accommodate both predators that, in part, feed on herring and the fishery, albeit at a lower level than under current approaches.

58.    In February of 2015, the New England Council and NMFS published a Notice of Intent to develop Amendment 8 and prepare an Environmental Impact Statement ("EIS").

59.    Following the comment period, the New England Council met in June 2015 to initiate Amendment 8, such as by adopting a set of goals and objectives.

60.    At that meeting, the Council voted to expand the amendment's objectives by adding to its purposes the goal of "address[ing] localized depletion in inshore waters."   Thus, as modified, Amendment 8 was to consider alternatives for addressing the issue of "localized depletion," as well as "to account for the role of Atlantic Herring within the ecosystem including

its role as forage" through the development of a new ABC control rule.  The final goal of the action was to "stabilize the fishery at a level designed to achieve OY."

61.   Because the issue of so-called localized depletion had not been considered in the initial scoping process, NMFS initiated a supplemental scoping period to take public comments. As the Notice of Intent explained:  "In general, localized depletion is when harvesting takes more fish than can be replaced either locally or through fish migrating into the catch area within a given time period."  80 Fed. Reg. 50825, 50825 (Aug. 21, 2015).

62.   Of note, at the June 2015 meeting, some members of the New England Council argued that the issue raised by commenters during the initial scoping period, which led to the expansion of Amendment 8's goals, was not the scientific question set forth in the supplemental notice.  Rather, they saw the issue as more of a perceived "user conflict"; *i.e.*, a conflict between the MWT sector and very vocal and determined groups of recreational fishing advocates, environmentalists, and other marine users who have long been hostile to MWT gear's use.

63.   Indeed, most of the restrictions described above were the results of a long-term advocacy campaign by different interest groups whose anecdotal and often self-interested claims have been used as justification.  Some of the advocates have publicly stated that they believe MWT gear should be prohibited in the fishery, even though the gear is widely used in sustainable American fisheries in the North Pacific and in European pelagic fisheries.  SFC participants regularly compete with their European counterparts in herring and mackerel markets when U.S. quotas are sufficiently high to allow for exporting.

64.   SFC participants see these long-running efforts, and the management measures adopted in response to them, as an attempt to make this type of fishing difficult and unprofitable.

**COMPLAINT AND PETITION FOR REVIEW**                                    **Page 14**

65.     After debating the proposed expansion of Amendment 8 at the June 2015 meeting, the Council declined to expand the amendment to include addressing ostensible issues of user conflict.  Further, motions to amend the goals to include "shift[ing] effort intensity away from inshore" and to alter the herring management area boundaries were defeated.  Rather, the Council voted to move forward solely on the issue of localized depletion, as defined above.

66.     Relying on that record and the Notice of Intent, SFC submitted comments that specifically declined to address any issues of user conflicts.  These comments focused instead on localized depletion as defined in the Notice of Intent; that is, as a scientific matter.

67.     However, when the Council met in April 2016 to discuss Amendment 8, and contrary to the decisions it made in June 2015 and the scope of the issues presented for public comment in the Notice of Intent, it adopted the following "Problem Statement":

> Scoping comments for Amendment 8 identified concerns with concentrated, intense commercial fishing of Atlantic herring in specific areas and at certain times that may cause detrimental **socioeconomic impacts** on other user groups (commercial, recreational, ecotourism) who depend upon adequate local availability of Atlantic herring to support business and recreational interests both at sea and on shore.  The Council intends to further explore these concerns through examination of the best available science on localized depletion, **the spatial nature of the fisheries**, **reported conflicts** amongst users of the resources and the concerns of the herring fishery and other stakeholders.

Amendment 8 FEIS, at 31.

68.     The conflation of the scientific issue of localized depletion with socioeconomic matters of asserted conflicts to support and justify a single set of alternatives made rational participation in the amendment's development impossible and allowed decision-makers to avoid explaining what problem the measures were designed to address.

69.     Complicating matters further, the specific goal the Council adopted for Amendment 8 was to "address localized depletion in inshore waters."  Amendment 8 FEIS at 31.

**COMPLAINT AND PETITION FOR REVIEW**                              **Page 15**

Ironically, another goal of the amendment is to "stabilize the fishery at a level designed to achieve optimum yield," *id.*, although the only measures actually adopted made it difficult, if not impossible to achieve this legally-required goal.

70.     NMFS' and the Council's scientific advisors were never able to identify whether or if such a thing as localized depletion, as a matter of biological concern was, in fact, occurring.

71.     Rather, all the Council's scientific advisors were able to do, ultimately, was to develop maps of overlap between the herring/mackerel MWT fishery, other fisheries, and other marine uses, such as whale watching (which is not an MSA-regulated activity) during particular months.  Due to limited data from many of these other fisheries and uses, the areas analyzed for this "overlap analysis" are relatively large.

72.     This analysis, which was the only scientific information available to the Council and Defendant with respect to the issues of localized depletion and user conflicts, did not ultimately inform the decisions made.  Nor did it show a significant impact on other marine uses from MWT fishing activity.

73.     For Amendment 8, the Council developed a suite of localized depletion/user conflict alternatives, including MWT exclusion zones that ranged from a six-mile closure off Cape Cod to a 50-mile exclusion zone throughout Areas 2 and 3.  One alternative would have barred MWT from fishing in Area 1A year around, while another would have redrawn the management area boundaries.  Most of these alternatives include sub-options that would, for instance, make the closure seasonal or year-round.

74.     The only alternative SFC supported would have reopened the offshore Gulf of Maine management area, 1B, to fishing in the winter months.  As this area comes close to Cape Ann (Massachusetts) and would have allowed the resumption of the winter herring and mackerel

fisheries in which that area's small herring quota could be caught at a time of year when there are fewer other marine stakeholders utilizing these waters.

75.     Prior to final action on Amendment 8, Defendant's designee, the Administrator for NMFS' Greater Atlantic Regional Office, Mr. Michael Pentony, in a letter to the Council, raised a series of concerns about the Draft EIS for Amendment 8, notably its lack of support for the alternatives being considered to allegedly address user conflicts and/or localized depletion.

76.     For example, Regional Administrator Pentony noted that Draft EIS failed to address the uncertainties associated with the assumed benefits of the exclusion zone alternatives in the amendment.[1]

77.     The letter went on to state:

> The Council's decisions on [the measures to address localized depletion/user conflicts] must be based on a clear and rational connection between the Council's stated purpose and need for the amendment, the analysis of the alternatives under consideration documented in the DEIS, and the expected benefits and costs to the various user groups involved.  In addition, the Council must clearly identify, acknowledge, and justify policy decisions that may have differential impacts on competing user groups.  For example, if a preferred alternative would restrict midwater trawl vessels but not restrict other gear types that also catch herring, the Council must consider the differential economic impacts on the different gear types and justify such a choice in light of the expected benefits of the action, consistent with the amendment's goals and objectives.  Similarly, the Council should consider the degree to which alternatives that restrict the herring fishery would provide biological or socio-economic benefits to other user groups that balance or outweigh the likely negative economic impacts on the herring fishery.  In addition, and in light of the overlap analysis in the DEIS, the Council should weigh the potential benefits to the competing user groups of broad area buffer zone restrictions with the potential benefits of smaller discrete area restrictions against the cost of each to the herring fishery, and the likelihood that such an approach would resolve or mitigate user group conflicts.

*Id.*

---

[1]  Letter from GARFO Regional Director Michael Pentony to Dr. John F. Quinn, at 1 (July 16, 2018).

78.     In the end, the Council crafted a wholly new alternative that was not among the set of eight alternatives analyzed in the draft environmental impact statement sent out for public hearings, although it was determined to fall within the range of the alternatives presented.

79.     This new "hybrid" alternative, referred to as "Alternative 10," was adopted by the Council, approved by the Defendant, and reflected in the final rule challenged here.  Alternative 10 creates a zone of twelve miles from shore in which only MWT vessels are prohibited from fishing.  This exclusion zone extends from the Canadian border to an area just east of Long Island and is in effect all year.  Additionally, the rule includes a buffer of approximately twenty miles off Cape Cod and Nantucket Island.

80.     The final EIS did not make any of the changes suggested as necessary by the NMFS Regional Administrator.   Nor did Defendant provide the "clear and rational connection" called for by law between the broad area selected and Amendment 8's purposes or utilize the only scientific information available to support this decision (the overlap analysis).  That analysis identified many areas and times of the year when little to no overlap occurs.  In short, none of the concerns raised by the agency were lawfully addressed.

81.     Amendment 8 also adopted a new ABC control rule.

82.     While SFC does not agree with the choices made in regard to the control rule, it is not a subject of this action.

83.     Despite the concerns previously raised by his designee, Defendant approved Amendment 8 in November 2019.  Defendant approved the Amendment 8 final rule, at issue here, on January 11, 2021.

**C.     AMENDMENT 8 AND ITS ADVERSE AND UNLAWFUL IMPACTS OF ON THE MWT HERRING FISHERY**

84.     According to Defendant's designees' analysis, the MWT exclusion zone covers an area from which this sector obtains up to forty-five percent of its annual revenues and is anticipate "to impact about 30% of total revenue for MWT herring vessels."  Amendment 8 FEIS, at 8.

85.     Furthermore, to the extent that herring now caught in the exclusion zone can be "made up" for by increasing effort in offshore waters, the daily fishing vessel operating costs of such fishing are about double those for fishing within twelve miles according to Defendant's analysis.  As such, net revenues from the fishery will be significantly reduced.

86.     In any event, it is unlikely that much of the harvest lost to the MWT sector will be recouped by fishing offshore because Atlantic herring are highly mobile and can only be found in the nearshore waters at certain times of the year.

87.     These adverse impacts are not outweighed by any biological, conservation, social, or economic benefits that have been identified in the Amendment 8 analyses.

88.      For instance, as Defendant has conceded, barring of MWT vessels from these waters constitutes an allocation of the right to fish for herring from this sector, primarily to a small number of purse seine vessels.

89.     However, there is no scientific information to suggest that "concentrated harvest" by purse seine vessels has any different biological impact or impact on "local availability" of herring than harvest by MWT vessels.   In fact, the analysis states that "[t]he method of removal [by purse seine or MWT] should not be relevant to the evaluation of localized depletion." Amendment 8 FEIS Appendices, at AVI-3.

90.     Nor is there any evidence that, but for the purse seine fleet and a small number of bottom-trawl vessels that have been granted exclusive access to all herring within the exclusion zone, any other user of these marine waters will benefit from the unlawful exclusion zone.  All that analysis was able to show was that the MWT fishery occurred in broadly the same areas at similar times as other fisheries, recreational angling, and other non-MSA regulated marine uses such as whale watching.  In fact, the analysis showed many areas and times of year, particularly winter months, where overlap of these activities with MWT fishing was minimal.

91.     All that Amendment 8 says in terms of benefits is:

> The impacts on predator fisheries and ecotourism of Alternative 10 would likely be *uncertain*, but *potentially* low positive relative to Alternative 1 [status quo].  *If* removing overlap of the midwater trawl Atlantic herring and predator fisheries and ecotourism is a positive outcome for the predator fisheries and ecotourism, this alternative *would have* a positive effect, based on the overlap analysis, *with its assumptions and limitations* (Section 4.1.2.3; Appendix VII). *If* MWT fishing shifts to other times/areas remaining open, there may be *negative* impacts to the degree new overlaps result.  *If* it is replaced by other gear types, negative outcomes for predator fisheries may result from overlap with these gears.

*Id.* at 480 (emphasis added).

92.     Additionally, in terms of biological impacts on herring predators within the exclusion zone, Amendment 8 states: "[T]his buffer closure could have negative fence effects that could shift all inshore effort and concentrate it just outside the boundary, if that boundary happens to overlap an important ocean feature that attracts predators, the impacts could be intensified, e.g., the Great South Channel."  Amendment 8 FEIS, at 354.

93.     In other words, if MWT fishing has negative impacts on predator species— something the analysis did not show—then these impacts are merely shifted, and perhaps exacerbated, by the exclusion zone.  Similarly, so-called "user conflicts" that may or may not be averted in near shore areas may or may not be newly created in the offshore areas.

**COMPLAINT AND PETITION FOR REVIEW**                                          **Page 20**

94.     Yet, despite these conditional, equivocal, and potentially counter-productive scientific findings, the Council and Defendant determined that the action is "likely" to provide "overall positive net benefits to society." *Id.* at 33.

95.     Defendant's determination that the exclusion zone is "likely" to provide net national benefits is unsupported by the analysis and overlook the findings suggesting that, to the extent any benefits for inshore predators and user groups exist at all, they will be counterbalanced by detrimental impacts on offshore predators and users.

96.     And while only anecdotal information provided by self-interested groups and individuals supported a finding of so-called "user conflicts," to the extent any such conflicts occurred, no other marine user or group of users of these waters is required by Amendment 8 to modify their operations in any way to alleviate such alleged conflicts.

97.     In contrast to the speculative and conditional potential benefits for some other user groups, Amendment 8 recognizes real and substantial harms to the MWT sector of the herring/mackerel fishery.

98.     For instance, the Amendment 8 FEIS noted: "With additional fishing restrictions inside 12 nm and to the east of Cape Cod, it would become more difficult for the fishery to harvest the Area sub-ACLs."  A8 FEIS at 477.  Analysis shows that all the MWT herring catch in Areas 1A and 1B comes from soon-to-be closed waters.  It also shows that a small, but increasingly important, portion of MWT herring and mackerel catch from Areas 2 and 3 are from locations into which herring and mackerel seasonally migrate that will be inaccessible under the rule at issue.  Even before these closures, the herring fishery was not catching the full sub-Annual Catch Limit from these areas in many years.  *Id.* at 477-478.

99.     Further, to the extent that some of this lost access can be made-up by increased fishing effort further offshore, the daily cost of catching those fish is double that of near-shore fishing.  This will reduce net income for the MWT sector.

100.    In summation, the very real and measurable harms to the MWT sector (along with the lobster fishery that relies on herring as bait and other offshore fisheries and marine uses that will face increased MWT effort) cannot be shown to be outweighed by the assumed and potential low benefits to other near-shore resource users.  In other words, Defendant's finding of positive "net national benefits" from the exclusion area is not supported by the record.

101.    Moreover, while Amendment 8's Problem Statement focused on "concerns with concentrated, intense commercial fishing of Atlantic herring in *specific areas* and at *certain times* that may cause detrimental socioeconomic impacts on other user groups (commercial, recreational, ecotourism) who depend upon adequate local availability of Atlantic herring to support business and recreational interests both at sea and on shore," Amend. 8 FEIS at 31 (emphasis added), the rule at issue closes broad areas on a year-round basis.

102.    The strained and unsupported findings by the Council and Defendant to justify the Amendment 8 exclusion zones demonstrate that this decision was simply a political compromise by a regulatory body that has, for years, been hectored and cajoled by activists seeking to gain benefits at the expense of a small and politically weak fishery sector.

103.    SFC participants have been harmed by the unlawful actions complained of and will continue to suffer harm if the relief sought is not granted.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Magnuson-Stevens Act, via APA)

104.    Plaintiff realleges paragraphs 1 through 103 as if set forth in full herein.

105.     The MSA provides that a fishery management regulation shall be set aside if it fails to conform with 5 U.S.C. §§ 706(2)(A), (B), (C), or (D).  *See* 16 U.S.C. § 1855(f).

106.     The APA, at section 706(2), proscribes agency action that is:

> (A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law . . . .

107.     Under the MSA, "[a]ny fishery management plan prepared, and any regulation promulgated to implement such plan, pursuant to this title shall be consistent with the … national standards for fishery conservation and management."  *Id.* § 1851(a).

108.     The regulations implementing Amendment 8 at issue herein represent "regulations," as that term is used in both 16 U.S.C. §§ 1855(f) and 1851(a).

109.     MSA National Standard 1 states: "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  *Id.* § 1851(a)(1).

110.     MSA National Standard 2 states: "Conservation and management measures shall be based on the best scientific information available." 16 U.S.C. § 1851(a)(2).

111.     "[A] regulation must be based on concrete analysis that permits the Secretary to 'rationally conclude that his approach would accomplish his legitimate objectives.'" *Fishing Co. of Alaska v. United States*, 195 F. Supp. 2d 1239, 1248 (W.D. Wash. 2002) (quoting *Parravano v. Babbitt*, 837 F. Supp. 1034, 1047 (N.D. Cal. 1993)).  Lacking such analysis, as is the case here, a regulation runs afoul of National Standard 2.

112.     MSA National Standard 4 states: "Conservation and management measures shall not discriminate between residents of different States.  If it becomes necessary to allocate or

assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; (C) carried out in such a manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." *Id.* (a)(4).

113.    National Standard 5 states: "Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose." *Id.* (a)(5).

114.    MSA National Standard 7 states: "Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." *Id.* (a)(7).

115.    Magnuson-Stevens Act National Standard 8 requires that:

> Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

*Id.* (a)(8).

116.    Amendment 8 violates National Standards 1, 2, 4, 5, 7, and 8, singularly and collectively, and the APA for, among others, the following reasons:

A.    The exclusion zone guarantees that the Atlantic herring fishery will be unable to achieve optimum yield on an ongoing basis, as required by National Standard 1, and provides no conservation benefit that can be identified;

B.    "While National Standard Two does not compel the use of specific analytic methods or require that an agency gather all possible scientific data before acting, the Standard does prohibit an agency from simply creating a rule based on mere political compromise." *Hadaja Inc., v. Evans*, 263 F. Supp. 2d 346, 353 (D.R.I. 2003). No scientific information supports findings that Amendment 8's exclusion zone meets either of the

purposes for which it was established or that it will result in net benefits. Rather, it was imposed to appease a vocal majority. In fact, Defendant failed to rely at all on the scientific information developed in support of the amendment.

C.   Amendment 8 allocates fishing privileges without fairness or equity, nor is the exclusion zone "reasonably calculated to promote conservation," all in violation of National Standard 4. For instance, it allocates nearly 100 percent of the herring resource in the Area 1A exclusion zone to a small number of purse seine vessels, which engage in the same type of concentrated harvest the rule is meant to discourage. Nor is any rational reason, either economic or conservation, been given for this allocation of fishing privileges.

D.   The allocation of all fishing privileges within the exclusion zone to less efficient gear types are compounded by the multiple inefficiencies the exclusion zone imposes on the MWT sector. Daily fishing costs beyond 12 miles are double that of nearshore fishing, and trip lengths will be increased as these vessels sail past inshore schools of herring to search offshore. Contrary to National Standard 5, there are no offsetting efficiencies gained for the herring vessels allowed to fish within the zone.

E.   To be compliant with National Standard 7, "supporting analyses for FMPs should demonstrate that the benefits of fishery regulation are real and *substantial* relative to the added research, administrative, and enforcement costs, as well as costs to the industry of compliance." 50 C.F.R. § 600.340(c) (emphasis added). No such "substantial" benefits have been identified.

F.   Amendment 8 found that "[t]he impacts on fishing communities of Alternative 10 are likely negative relative to Alternative 1 [no action]." Amendment 8 FEIS, at 481. Defendant failed to meet the obligations imposed by National Standard 8 by failing to utilize the best scientific information available; by taking a "net benefits" approach, which purports to claim benefits of the actions to communities engaged in other marine uses counter-balance impacts on MWT-dependent communities; and, relatedly, failing to consider measures to minimize adverse economic impacts on these fishing communities and to provide for their sustained participation in the fishery.

117.   For these and other reasons, Defendant acted contrary to law, arbitrarily and capriciously, and abused his discretion, in violation of the APA and MSA.

## SECOND CLAIM FOR RELIEF
### (Magnuson-Stevens Act, via APA)

118.   Plaintiff realleges paragraphs 1 through 117 as if set forth in full herein.

119.   The APA, at section 706(2), proscribes agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law [or] without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

120.   MSA section 1851(a)(9)(A), as amended, requires that an amendment "assess, specify, and analyze the likely effects, if any, including the cumulative conservation, economic, and social impacts, of the conservation and management measures on, and possible mitigation measures for, participants in the fisheries and fishing communities affected by the plan or amendment."  16 U.S.C. § 1851(1)(9)(A).

121.   Defendant acted in a manner contrary to law, abused his discretion, and was arbitrary and capricious by failing to provide a lawful fishery impact statement for Amendment 8, particularly by failing to assess the cumulative impacts of all conservation and management measures on the participants in the Atlantic herring fishery and fishing communities impacted by Amendment 8.

## THIRD CLAIM FOR RELIEF
### (APA)

122.   Plaintiff realleges paragraphs 1 through 121 as if set forth in full herein.

123.   The APA, at section 706(2), proscribes agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law [or] without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

124.   An agency action, such as Amendment 8 and its implementing regulations, is arbitrary and capricious if the agency fails to make a "rational connection between the facts

found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962).

125.     Amendment 8 and its implementing regulations are arbitrary and capricious, for, among other reasons, assuming benefits of the action that are unsupported by the record, relying on assertions that are contradicted by the record, and overlooking major aspects of the problem that the exclusion zone was implemented to address.  Defendant was arbitrary and capricious, violated applicable law, and abused his discretion by approving Amendment 8 and its implementing regulations.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiff respectfully seeks an Order of this Court:

1) Finding that Amendment 8 and its implementing regulations at issue to be arbitrary and capricious, an abuse of discretion in excess of authority, and not in accordance with law, and therefore unlawful;

2) Enjoining the illegal regulations and remanding Amendment 8 to the Secretary for further proceedings consistent with law;

3) Declaring, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that Amendment 8 and its implementing regulations were promulgated in violation of the APA and MSA for, among others, reasons stated above;

4) Awarding Plaintiff its costs and attorneys' fees as appropriate;

5) Granting such other relief as is just and proper.

Dated: February 5, 2021                     Respectfully submitted,

*/s/ Shaun M. Gehan*
Shaun M. Gehan (D.C. Bar No. 483720; Maine Bar No. 9380; Mass. Bar No. 654268 (inactive))
The Law Office of Shaun M. Gehan
1101 30th Street, N.W., Suite 500
Washington, D.C.  20007
Telephone: (202) 412-2508;
E-mail: sgehan@gehanlaw.com
*Attorney for Plaintiff Sustainable Fisheries Coalition*

**COMPLAINT AND PETITION FOR REVIEW**                                    **Page 27**